1
2
3
4
5
6
7

United States District Court
For the Northern District of California

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11

| | |
|---|---|
| BE IN, INC., a New York Corporation | ) Case No.: 12-CV-03373-LHK |
| Plaintiff, | ) ORDER GRANTING DEFENDANTS' <br> ) MOTION TO DISMISS PLAINTIFF'S <br> ) FIRST AND FOURTH CAUSES OF |
| v. | ) ACTION WITHOUT PREJUDICE AND <br> ) GRANTING WITH PREJUDICE |
| GOOGLE INC., a California corporation, <br> YOUTUBE, LLC, a Delaware limited liability <br> company, and GOOGLE UK LTD., a private <br> limited company registered in England and <br> Wales, | ) DEFENDANTS' MOTION TO DISMISS <br> ) PLAINTIFF'S THIRD CAUSE OF <br> ) ACTION <br> ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) |

12
13
14
15
16
17
18
19

20        Plaintiff Be In, Inc. ("Be In"), the developer of http://camup.com and its associated

21 software ("CamUp"), filed this action against Defendants Google, Inc. ("Google"), YouTube, LLC

22 ("YouTube"), and Google UK Ltd. ("Google UK") seeking damages and injunctive relief to

23 remedy Defendants' alleged misappropriation of trade secrets, copyright infringement, breach of

24 contract, and breach of implied contract stemming from Google's release of software allegedly

25 similar to CamUp. Second Am. Compl., ECF No. 59 ("SAC"). Defendants move for dismissal of

26 Be In's first, third, and fourth claims: misappropriation of trade secrets, breach of implied contract,

27 and breach of contract. Mot. to Dismiss, ECF No. 64 ("MTD"). Defendants also move for

28

1

Case No.: 12-CV-03373-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AND FOURTH CAUSES OF
ACTION WITHOUT PREJUDICE AND GRANTING WITH PREJUDICE DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S THIRD CAUSE OF ACTION

dismissal of Be In's request for statutory copyright damages. *Id.* Having considered the submissions of the parties, the relevant law, and the record in this case, the Court GRANTS the Motion to Dismiss with leave to amend as to Be In's first and fourth claims and with prejudice as to Be In's third claim. Be In agrees not to seek statutory copyright damages, so the Court GRANTS the Motion to Dismiss this request.

## I.   BACKGROUND

### A.   Factual Allegations

Be In is the maker of CamUp, a "social entertainment consumption platform that allows a group of friends to simultaneously watch, listen, chat and collaborate around shared videos, music, and other media, such as educational content and documents, in a real-time, trusted environment." SAC ¶ 1. Each user on CamUp is given a virtual "room," consisting of a large frame for viewing media, smaller video frames for video chat participants, a sidebar for text-based chatting, and a shared, editable playlist for controlling the content of the media frame. *Id.* ¶ 27. As a platform, CamUp is "designed to create a sense of intimacy, familiarity, and trust." *Id.* ¶ 28.

CamUp was conceived in 2007, developed over the subsequent years, and publicly announced in March 2011 at the SXSW Interactive conference in Austin, Texas. *Id.* ¶¶ 18, 24. Representatives from Google attended the conference and viewed demonstrations of CamUp. *Id.* ¶ 33. When Be In demonstrated CamUp in Cannes, France the following month, "[a]t least one senior Google and YouTube executive" was present. *Id.* ¶ 36. In April and May of 2011, Be In reached out directly to Richard Robinson, an employee of Google UK, a wholly-owned Google subsidiary, to pitch CamUp as part of a larger, confidential business strategy for turning the "massive—but unstructured and largely anonymous—user base[s]" of "first party content partners (like Google)" into an "organized social community that would foster shared social experiences." *Id.* ¶¶ 38–40.

Case No.: 12-CV-03373-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AND FOURTH CAUSES OF ACTION WITHOUT PREJUDICE AND GRANTING WITH PREJUDICE DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S THIRD CAUSE OF ACTION

1    Be In executives met with Robinson on or about May 12, 2011.[1] *Id.* ¶ 47. Prior to the

2    meeting, Be In represented to Robinson that it wished to share trade secrets and confidential

3    business strategies, but would only do so with the protection of a nondisclosure agreement. *Id.*

4    ¶¶ 44–45. Google agreed to enter into an NDA and prepared a nondisclosure agreement that Be In

5    electronically signed (the "NDA"). *Id.* ¶ 46; *see also* ECF No. 64-2 (copy of the NDA). Pursuant to

6    the NDA, Be In disclosed its confidential strategies, including a method for integrating CamUp

7    into the YouTube video streaming service by way of a button that allows users to jointly view a

8    given YouTube video in "CamUp's trusted social environment." SAC ¶ 41. Following the meeting,

9    Be In emailed Robinson with a summary of "key aspects" of the confidential Be In strategies. *Id.*

10    ¶ 52. Be In executives were pleased with the meeting and expressed appreciation for the

11    protections provided by the NDA, *id.* ¶ 55, though neither Robinson nor any of the Defendants

12    ultimately followed up on the meeting and Robinson ceased responding to Be In's emails. *Id.* ¶ 56.

13    However, Be In alleges on information and belief that, following the meeting with Robinson,

14    Defendants repeatedly visited the CamUp website "for the purpose of copying the CamUp

15    platform." *Id.* ¶ 57.

16    On or about June 28, 2011, less than two months after Be In's meeting with Robinson,

17    Google launched a video chat utility called "Hangouts" as part of its new "Google+" social

18    network. *Id.* ¶¶ 60–61. Hangouts was "virtually identical" to CamUp. *Id.* ¶ 61. Both products had

19    "a large, central frame, for viewing shared media" positioned above "up to ten smaller video

20    frames, organized in a single row" for displaying participants' video feeds. *Id.* ¶ 62. Be In alleges

21    that the frames for Hangouts and CamUp "were in similar proportions," both had "large and bulky"

22    buttons, both put their respective logos in the upper left corner, and both featured similar icons for

23    indicating a "free seat" in the video chat session. *Id.* ¶ 64. On August 18, 2011, Google integrated

24    Hangouts into YouTube "using the precise mechanism and strategy . . . disclosed to Google during

25    the May, 2011 meeting." *Id.* ¶ 68. Be In alleges that Hangouts and its subsequent integration into

[1] While ¶ 47 of the SAC refers to a May 12, 2012 meeting, the surrounding context makes it clear that the year was a typographical error and that the meeting allegedly took place in 2011.

26

27

28

3

United States District Court
For the Northern District of California

the Google product line was "the precise strategy Be In had shared with Google in confidence." *Id.* ¶ 72.

Based on the foregoing allegations, CamUp brought this action, alleging that (1) Defendants misappropriated Be In trade secrets learned in connection with the May 2011 meeting, (2) Defendants infringed Be In's copyright in the CamUp website, (3) Defendants breached an implied contract not to use Be In's confidential business strategies without compensating Be In for such use, and (4) Defendants breached the CamUp website's terms of service by visiting the CamUp website for the purpose of copying, downloading, reproducing, distributing, or exploiting portions of the CamUp website for commercial purposes. *Id.* ¶¶ 78–103. Defendants move the Court to dismiss the first, third, and fourth claims, as well as Be In's request for statutory copyright damages. ECF No. 64.

### B.    Procedural History

Be In filed its SAC on June 10, 2013. ECF No. 59. Defendants filed a Motion to Dismiss the first, third, and fourth claims of the SAC on July 7, 2013. ECF No. 64. Be In filed an Opposition to the Motion to Dismiss on August 1, 2013. ECF No. 65 ("MTD Opp."). Defendants filed a reply on August 15, 2013. ECF No. 69.

## II.    LEGAL STANDARD

### A.    Motion to Dismiss

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In considering whether the complaint is sufficient to state a claim, the court must accept as true all of the factual allegations contained in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, the court need not accept as true "allegations that contradict matters properly subject to judicial notice or by exhibit" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotations omitted). While a complaint need not allege detailed factual allegations, it

Case No.: 12-CV-03373-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AND FOURTH CAUSES OF ACTION WITHOUT PREJUDICE AND GRANTING WITH PREJUDICE DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S THIRD CAUSE OF ACTION

1  "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

2  on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

3  (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference

4  that the defendant is liable for the misconduct alleged." *Id.* at 678. "Determining whether a

5  complaint states a plausible claim for relief . . . [is] a context-specific task that requires the

6  reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

7  **B.      Leave to Amend**

8        If the Court determines that a complaint should be dismissed, it must then decide whether to

9  grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend

10  generally shall be denied only if allowing amendment would unduly prejudice the opposing party,

11  cause undue delay, or be futile, or if the moving party has acted in bad faith. *See Leadsinger, Inc. v.*

12  *BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

13  **III.    ANALYSIS**

14        The Court addresses each claim subject to dismissal in the order of its appearance in Be In's

15  SAC.

16        **A.      Misappropriation of Trade Secrets**

17        Defendants argue that this Court should dismiss Be In's claim under the California Uniform

18  Trade Secrets Act ("UTSA") because Be In has failed to plead facts sufficient for the Court to find

19  that Defendants misappropriated trade secrets for the purposes of UTSA. For the reasons stated

20  below, the Court agrees with Defendants and DISMISSES without prejudice Be In's UTSA claim.

21        "Misappropriation of trade secrets is an intentional tort. *PMC, Inc. v. Kadisha*, 78 Cal. App.

22  4th 1368, 1382 (Cal. Ct. App. 2000). "To state a cause of action for misappropriation of trade

23  secrets under the Uniform Trade Secrets Act . . . , a plaintiff must plead two primary elements: (1)

24  the existence of a trade secret, and (2) misappropriation of the trade secret." *AccuImage*

25  *Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003) (citing Cal. Civ.

26  Code § 3426.1(b)) (footnote omitted). Pleading misappropriation is required, as "[a]lleging mere

27

28

Case No.: 12-CV-03373-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AND FOURTH CAUSES OF
ACTION WITHOUT PREJUDICE AND GRANTING WITH PREJUDICE DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S THIRD CAUSE OF ACTION

possession of trade secrets is not enough to survive a 12(b)(6) motion." *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 989 (S.D. Cal. 2012) (internal quotations omitted).

The UTSA defines "misappropriation" as, in relevant part,

"(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who . . . [u]sed improper means to acquire knowledge of the trade secret."

CAL. CIV. CODE § 3426.1(b)(1) and (2). Plaintiffs do not specify which form of trade secret misappropriation Defendants allegedly committed, either acquisition by improper means or disclosure/use by improper means. However, Plaintiff's allegations appear to focus on alleged use by improper means. Nonetheless, regardless of the form of misappropriation, Plaintiff fails to allege impropriety by Defendants.

Both forms of trade secret misappropriation require that the acquisition or disclosure/use of a trade secret be committed by "improper means." "Improper means" is itself a defined term, which by statute "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 3426.1(a). It follows that where an UTSA plaintiff seeks to show misappropriation by "breach or inducement of a breach of a duty to maintain secrecy," *id.*, that party must demonstrate that the defendant (1) had a duty to maintain secrecy, and (2) breached that duty.

Be In's apparent theory of misappropriation is based on Defendants' "breach or inducement of a breach of a duty to maintain secrecy." CAL. CIVIL CODE § 3426.1(a); *cf.* MTD Opp. at 10–11. The Court agrees with Be In that by pleading the formation of the NDA and the subsequent transfer of confidential information to Google UK, "Be In has pled in detail how its trade secrets were . . . disclosed under an obligation of confidentiality," and therefore successfully pleads "a duty to maintain secrecy" for the purposes of UTSA. MTD Opp. at 10–11; *see also* SAC ¶ 47-51 (describing the NDA and Be In's disclosures to Robinson). However, Be In does not allege a

6

1    *breach* of that obligation as is required by the text of the statute. Be In's only relevant factual

2    allegations are found in two conclusory statements. *See* MTD Opp. at 11 (relying on these two

3    statements to rebut Defendants' argument that "Be In is no longer claiming that Mr. Robinson 'or

4    anyone else' communicated these trade secrets to Google"). First, Be In alleges that "[t]he features,

5    strategies, and collaborations undertaken by Google since the launch of Hangouts constitute the

6    misappropriation and unauthorized use of Be In's trade secrets." *Id.* ¶ 75. Second, Be In alleges

7    that "Defendants have acquired, disclosed, and/or used or intend to use Plaintiff's trade secrets

8    through improper means." SAC ¶ 80. Neither specifically alleges that Google breached its

9    obligation of confidentiality in acquiring, disclosing, or using Plaintiff's trade secrets. Accordingly,

10   Be In fails to allege that Defendants used improper means to acquire, disclose, or use Be In's trade

11   secrets. Without a showing of improper means, the Court finds that Be In's SAC fails to properly

12   plead impropriety, an essential element of an UTSA trade secret misappropriation claim.[2]

13       Be In's arguments against Defendants' Motion to Dismiss are unavailing. Be In claims,

14   without support, that the SAC's recitation of "disclosure . . . and subsequent use" of an alleged

15   trade secret to and by Defendants is "more than sufficient to state a claim for trade secret

16   misappropriation." MTD Opp. at 9–10, 13–14. On the contrary, a UTSA plaintiff must plead

17   misappropriation, and misappropriation requires the use of improper means to acquire knowledge

18   of the trade secret. *See* CAL. CIV. CODE § 3426.1(b).

19       Further, none of the cases Be In cites are on point. None of them address the specific issue

20   in this case, namely, whether a misappropriation claim can survive a motion to dismiss where the

21   claim is premised on a breach of an obligation of secrecy but the plaintiff does not allege such

22   breach in his complaint.[3] In *TMX Funding, Inc. v. Impero Technologies, Inc.*, No. 10-CV-00202,

---

[2] The Court notes that Be In could have alleged improper means by alleging disclosure or use of a
trade secret in violation of the parties' NDA. *See Ajaxo Inc. v. E*Trade Grp., Inc.*, 37 Cal. Rptr. 3d
221, 255 (Cal. Ct. App. 2005) (holding that disclosure or use of a trade secret in violation of a
nondisclosure agreement is disclosure or use by improper means).

[3] That Be In has struggled to find on-point case law is not surprising. It is rare that a party
possessing a valid and enforceable NDA would attempt to build a UTSA claim without also
alleging a breach of the NDA in the UTSA claim. "While [an] NDA might not be [the] only
theoretical path to recovery for the alleged misappropriation of . . . confidential information, it is by

7

2010 WL 2509979 (N.D. Cal. June 17, 2010), the alleged misappropriation was based on theft, *id.* at \*1, and the pleadings specifically alleged "the misappropriated information, . . . the method used to misappropriate the information, and . . . the [] date on which the information was misappropriated." *Id.* at \*12. *SOAProjects, Inc. v. SCM Microsystems, Inc.*, No. 10-CV-01773, 2010 WL 5069832 (N.D. Cal. Dec. 7, 2010), is also inapposite because *SOAProjects* did not involve a plaintiff who had neglected to allege a breach of an obligation of confidentiality by the defendants. *Id.* at \*10–11. Last, *Vinyl Interactive, LLC v. Guarino*, No. 09-CV-0987, 2009 U.S. Dist. LEXIS 41498 (N.D. Cal. May 1, 2009), is cited by Be In only for the proposition that "it would be unreasonable to require [plaintiff] to demonstrate . . . the precise ways in which [d]efendants may have used [plaintiff's] trade secrets, given that [d]efendants are the only ones who possess such information." *Id.* at \*21; *see* MTD Opp. at 14. *Vinyl Interactive* is distinguishable because in the instant case Be In has failed to plead impropriety at all which is a necessary element of a misappropriation claim. The modest allegations necessary to plead impropriety fall far below the precise showing discussed in *Vinyl Interactive*.

Because Be In fails to plead sufficient facts underlying its misappropriation claim, the Court GRANTS without prejudice Defendants' Motion to Dismiss Be In's cause of action under the UTSA. Under Rule 15(a), leave to amend generally shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *See Leadsinger*, 512 F.3d at 532. Because none of these conditions are met, the Court finds it appropriate to grant Be In leave to amend its complaint and plead additional facts in support of its claim.

**B.    Breach of Implied Contract**

Defendants move the Court to dismiss Be In's claim for breach of implied contract, arguing that the alleged implied contract conflicts with the express terms of the NDA, does not contain

---

far the simplest and most promising path. . . . Proving an intentional breach of the NDA would get [plaintiff] most of the way, if not all the way, to recovery under its various tort claims." *Stonyfield Farm, Inc. v. Agro-Farma, Inc.*, No. 08-CV-488, 2009 WL 3255218 (D.N.H. Oct. 7, 2009).

8

United States District Court
For the Northern District of California

1    material terms, and is an unenforceable "agreement to agree." MTD at 14–22. Be In claims that it

2    formed an implied-in-fact contract with Defendants that conditioned Be In's confidential disclosure

3    of its proprietary information on Defendants' agreement to make use of the information only after

4    licensing the CamUp platform. SAC ¶¶ 53, 93–95. The Court agrees with Defendants that the

5    implied contract covers the same subject matters as the express terms of the NDA, and therefore

6    GRANTS with prejudice Defendant's Motion to Dismiss Be In's claim for breach of implied

7    contract.

8            As a preliminary matter, the parties agree that California law controls Be In's implied

9    contract claim. *See* MTD Opp. at 19 n.5; MTD at 14 n. 4. Contracts may be formed expressly or by

10   implication. *Guz v. Bechtel Nat. Inc.*, 8 P.3d 1089, 1101 (2000). An implied contract arises "from

11   the parties' conduct evidencing their actual mutual intent to create . . . enforceable limitations." *Id.*

12   (emphasis omitted). However, "it is well settled that an action based on an implied-in-fact or quasi-

13   contract cannot lie where there exists between the parties a valid express contract covering the

14   same subject matter." *Lance Camper Mfg. Corp. v. Republic Indem. Co.*, 44 Cal. App. 4th 194, 203

15   (Cal. Ct. App. 1996). Instead, the express contract controls. *See id.* This is consistent with

16   California statutory law, which provides that "[t]he execution of a contract in writing . . .

17   supersedes all the negotiations or stipulations concerning its matter which preceded or

18   accompanied the execution of the instrument." CAL. CIV. CODE § 1625.

19           Here, the parties do not dispute the existence of the NDA alleged in the SAC or that the

20   NDA is an enforceable express contract. Defendants have provided a full copy of its text, *see* ECF

21   No. 64-2, which the Court may consider in the context of this Fed. R. Civ. P. 12(b)(6) motion as a

22   document incorporated by reference into the SAC. *See In re Stac Electronics Sec. Litig.*, 89 F.3d

23   1399, 1405 n.4 (9th Cir. 1996). The only question the Court must resolve is whether the subject

24   matter of the alleged implied contract is the same as the subject matter of the NDA. If it is, then

25   there can be no cause of action arising from the implied contract. For the reasons explained below,

26

27

28
                                                        9

1    the Court finds that the contracts cover the same subject matter, and thus that Be In cannot bring a

2    cause of action arising from the alleged implied contract.

3            First, the Court sets forth the relevant scope of each contract. The NDA prohibits

4    Defendants from using or disclosing Be In's confidential information, as defined in the agreement,

5    except as expressly permitted by the agreement. ECF No. 64-2. The NDA creates a duty of

6    confidentiality as follows:

7            In order to evaluate, and if appropriate enter into and complete, one or more
             business transactions from time to time (the "Purpose"), Google Ireland Limited
8            ("Google") and [Be In] agree [to] this NDA as follows. . . . One party [broadly
             construed as including group companies and agents] (the "Discloser") may disclose
9            to the other party [similarly construed] (the "Receiver") information related to the
             Purpose that the Discloser considers confidential (the "Confidential Information").
10           . . . Receiver may only use Confidential Information for the Purpose. Receiver shall
             protect Confidential Information and prevent any unauthorized use or disclosure of
11           Confidential Information. . . . No party acquires any intellectual property rights
             under this NDA except the limited rights necessary to use the confidential
12           Information for the Purpose.

13   *Id.* The remainder of the NDA is primarily concerned with narrowing the scope of "Confidential

14   Information" and the duty created above. The NDA provides in relevant part:

15           Confidential Information does not include information that: (a) was known to
             Receiver without restriction before receipt from Discloser; (b) is publicly available
16           through no fault of Receiver; (c) is lawfully received by Receiver from a third party
             without a duty of confidentiality; or (d) is independently developed by Receiver. . . .
17           Unless the parties otherwise agree in writing, Receiver's duty to protect
             Confidential Information expires five years from disclosure. . . . This NDA imposes
18           no obligation to proceed with any business transaction. . . . This NDA is the parties'
             entire agreement on this topic, superseding any other agreements. Any amendments
19           must be in writing.

20   *Id.* In comparison, Be In's alleged implied contract "protects Be In's reasonable expectation to

21   receive compensation if Google utilized its idea beyond mere evaluation," MTD Opp. at 22, by

22   conditioning Be In's disclosure of its confidential information on Defendants' agreement that

23   Defendants "would utilize [the confidential information] only if, and when, they licensed the

24   CamUp platform from Be In, thereby compensating Be In for the value of those proprietary

25   business strategies." SAC ¶ 93.

26

27

28   Case No.: 12-CV-03373-LHK
     ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AND FOURTH CAUSES OF
     ACTION WITHOUT PREJUDICE AND GRANTING WITH PREJUDICE DEFENDANTS' MOTION TO DISMISS
     PLAINTIFF'S THIRD CAUSE OF ACTION

United States District Court
For the Northern District of California

The Court now evaluates whether the NDA and the alleged implied agreement cover the same subject matter. Because the NDA limits Defendants' permissible uses of confidential information "to evaluat[ion], and if appropriate ent[ry] into and complet[ion of], one or more business transactions," ECF No. 64-2 at 2, Be In contends that a second contract, i.e., the implied contract, might establish Be In's right to compensation for Defendants' use of the confidential information without covering "the same subject matter" as the NDA. *See* MTD Opp. at 19, 21–22. The Court disagrees. Both the NDA and the alleged implied agreement cover the same subject matter because both purport to establish the scope of Defendants' permissible use of the information Be In provided to Robinson in May of 2011 and to prohibit Defendants' use of that information for business purposes in some fashion. The express contract does so, in essence, by saying "do not use the information beyond the scope of this contract or else face a penalty," while the implied contract counters, "use the information outside the scope of the express contract only upon paying a royalty." *Compare* SAC ¶¶ 44–46 (describing the formation of the NDA) *and* ECF No. 64-2 (providing the text of the NDA) *with* SAC ¶¶ 53, 93–95 (describing the genesis and content of the implied agreement). The two competing contracts also present the same basis for the prohibition: Be In's claimed property right in its confidential strategies.

Because the alleged implied contract covers the same subject matter as the express contract, and in light of how the NDA expressly states that "[t]his NDA is the parties' entire agreement on this topic, superseding any other agreements," *see* ECF No. 64-2, the Court finds that Be In cannot bring an action based on the alleged implied contract. "[W]here the parties have freely, fairly and voluntarily bargained for certain benefits in exchange for undertaking certain obligations, it would be inequitable to imply a different liability and to withdraw from one party benefits for which he has bargained and to which he is entitled." *Wal-Noon Corp. v. Hill*, 45 Cal. App. 3d 605, 613 (Cal. Ct. App. 1975). The Court refuses to so alter the arrangement between the parties as established by the NDA. The deficiency here is a legal one that cannot be cured by more factual allegations. Thus,

Case No.: 12-CV-03373-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AND FOURTH CAUSES OF ACTION WITHOUT PREJUDICE AND GRANTING WITH PREJUDICE DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S THIRD CAUSE OF ACTION

1    amendment would be futile. Accordingly, the Court GRANTS Defendants' Motion to Dismiss Be

2    In's claim for breach of implied contract with prejudice.

3         **C.**     **Breach of Contract**

4         Defendants argue that Be In has failed to state a cause of action for breach of contract in its

5    allegations that Defendants violated the CamUp website's terms of service (the "Terms of

6    Service"). MTD at 11–14. Because Be In's SAC fails to provide factual grounding from which Be

7    In can show the formation of a contract, the Court agrees with Defendants and GRANTS without

8    prejudice Defendants' Motion to Dismiss Be In's claim for breach of contract.

9         As a preliminary matter, neither party makes a firm contention as to what contract law

10   governs the Terms of Service. Defendants note that some versions of the Terms of Service contain

11   a choice of law provision specifying that New York law should govern. MTD at 11 n.1. However,

12   the parties agree "that the elements of a contract cause of action are substantially the same whether

13   New York or California law ultimately governs." *Id.*; MTD Opp. at 15 n.3. Because the Court

14   agrees that the contract formation law of both California and New York is substantively similar in

15   relevant part and thus that the choice of law has no bearing on the outcome of Defendants' motion,

16   the Court does not here decide which law governs.

17        In both New York and California, the formation of a contract requires a "manifestation of

18   mutual assent." *Maas v. Cornell Univ.*, 721 N.E.2d 966, 970 (N.Y. 1999) (citing Restatement

19   (Second) of Contracts § 18 (1981)); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir.

20   2002) (applying California law). Indeed, such a manifestation is "the touchstone of contract."

21   *Specht*, 306 F.3d at 29. "The conduct of a party is not effective as a manifestation of his assent

22   unless he intends to engage in the conduct and knows or has reason to know that the other party

23   may infer from his conduct that he assents." Restatement (Second) of Contracts § 19 (1981).

24        This case requires the Court to consider the issue of mutual assent as an element in the

25   formation of so-called "browsewrap" agreements.[4]  Browsewrap agreements are those that purport

26   ────────────────

27   [4] This term is not to be confused with "clickwrap" agreements or "shrinkwrap" agreements, from which the term is derived. *See generally Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 428–29

28   

12

Case No.: 12-CV-03373-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AND FOURTH CAUSES OF
ACTION WITHOUT PREJUDICE AND GRANTING WITH PREJUDICE DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S THIRD CAUSE OF ACTION

1   to bind the users of websites to which the agreements are hyperlinked. Generally, the text of the

2   agreement is found on a separate webpage hyperlinked to the website the user is accessing. The

3   browsewrap agreements are generally entitled "Terms of Use" or "Terms of Service." The defining

4   feature of browsewrap agreements is that the user can continue to use the website or its services

5   without visiting the page hosting the browsewrap agreement or even knowing that such a webpage

6   exists. How much notice the user has of the existence of the agreement varies in large part based on

7   the design and content of the website and the browsewrap agreement's webpage. Often, the

8   hyperlinks which point to the browsewrap agreement are explicit about both the binding nature of

9   the agreement and the fact that continued use of the website will act as a manifestation of the user's

10  intent to be bound. For example, in *Cairo, Inc. v. Crossmedia Services., Inc.*, No. 04-04825, 2005

11  WL 756610 (N.D. Cal. Apr. 1, 2005), every page on the website at issue had a text notice that read:

12  "By continuing past this page and/or using this site, you agree to abide by the *Terms of Use* for this

13  site, which prohibit commercial use of any information on this site." *Id.* at *2 (emphasis used to

14  identify hyperlink). However, even where the text is explicit, the design might compromise the

15  text's ability to provide notice to the user. *See, e.g.*, *Pollstar v. Gigmania, Ltd.*, 170 F. Supp. 2d

16  974, 981 (E.D. Cal. 2000) (the text "use is subject to *license agreement*" was provided in small

17  gray print on a gray background, without visible notice of the fact that the text "license agreement"

18  was in fact a hyperlink) (emphasis added to identify hyperlink).

19       Despite their ubiquity, browsewrap agreements are still relatively new to the courts. The

20  leading case on the subject is then-Second Circuit Judge Sotomayor's opinion in *Specht*, which

21  applies the foundational principles of contract law described above to the problem of browsewrap

22  contract formation. 306 F.3d 17. In *Specht*, the plaintiffs downloaded gratis software from a

23

24  (2d Cir. 2004) (comparing shrinkwrap, clickwrap, and browsewrap agreements). "Clickwrap"
    agreements require users to actively click a radio button, checkbox, or hyperlink in order to
25  unambiguously manifest the user's assent to the terms of the agreement, while shrinkwrap
    agreements "typically involve[] (1) notice of a license agreement on product packaging (*i.e.*, the
26  shrinkwrap), (2) presentation of the full license on documents inside the package, and (3)
    prohibited access to the product without an express indication of acceptance." *Id.*

27

28                                          13
    Case No.: 12-CV-03373-LHK
    ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AND FOURTH CAUSES OF
    ACTION WITHOUT PREJUDICE AND GRANTING WITH PREJUDICE DEFENDANTS' MOTION TO DISMISS
    PLAINTIFF'S THIRD CAUSE OF ACTION

United States District Court
For the Northern District of California

webpage by way of a hyperlinked "Download" button. *Id.* at 22. Had those plaintiffs scrolled down

further, past the "Download" button, they would have encountered an exhortation to "review and

agree to the terms of the . . . *software license agreement* before downloading and using the

software." *Id.* (emphasis used to identify hyperlink). The Second Circuit held that the downloaders

were not bound to the license agreement's terms because "a reasonably prudent offeree in

plaintiffs' position would not have known or learned, prior to acting on the invitation to download,

of the reference to [the] license terms hidden below the 'Download' button on the next screen." *Id.*

at 35. Without actual or constructive knowledge of the terms, the court could not find the mutual

assent required for the formation of a contract. *See id.*; *see also Jerez v. JD Closeouts, LLC*, 943

N.Y.S.2d 392, 398 (N.Y. Dist. Ct. 2012) (applying *Specht* in browsewrap case and holding that

"'submerged' forum selection clauses will not be enforced under basic contract law principles").

Subsequent decisions hew closely to the logic of *Specht* but nonetheless reach disparate and

fact-specific conclusions. Most courts upholding the enforceability of browsewrap agreements

have done so in circumstances where notice to the defendant was firmly established in the factual

record. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 401–04 (2d Cir. 2004) (finding

likelihood of success on the merits in a breach of browsewrap claim where the defendant "admitted

that . . . it was fully aware of the terms" of the offer); *Sw. Airlines Co. v. BoardFirst, L.L.C.*, 06-

CV-0891, 2007 WL 4823761 at *4–6 (N.D. Tex. Sept. 12, 2007) (finding proper formation of a

contract where defendant continued its breach after being notified of the terms in a cease and desist

letter); *Cairo*, 2005 WL 756610 (enforcing browsewrap forum selection clause where plaintiff

"admit[ted] to actual knowledge" of the agreement); *Ticketmaster Corp. v. Tickets.Com, Inc.*, No.

CV-997654, 2003 WL 21406289 (C.D. Cal. Mar. 7, 2003) (denying defendants' summary

judgment motion on browsewrap contract claim where defendant continued breaching the contract

after receiving letter quoting the browsewrap contract terms). Also, the more that a browsewrap

agreement looks like a clickwrap agreement, the more willing courts are to find the notice

necessary to give rise to constructive assent. *See Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835,

Case No.: 12-CV-03373-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AND FOURTH CAUSES OF
ACTION WITHOUT PREJUDICE AND GRANTING WITH PREJUDICE DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S THIRD CAUSE OF ACTION

838–40 (S.D.N.Y. 2012) (enforcing forum selection clause in terms of service linked to webpage that provided "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service" against user who clicked "Sign Up").

Conversely, courts presented with facts tending to show that the reasonably prudent offeree would be unaware of the browsewrap terms generally refuse to find an enforceable agreement. *See Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 792–93 (N.D. Ill. 2011) (refusing to enforce browsewrap arbitration clause in website terms of use which was only noticeable after a "multi-step process" of clicking through nonobvious links); *Jerez*, 943 N.Y.S.2d at 398 (finding browsewrap forum selection clause unenforceable when it was "buried" and "could only be found by clicking on an inconspicuous link on the company's 'About Us' page"). At least one court has found that actions seeking to enforce website terms of use as an enforceable browsewrap contract must allege more than the mere existence of a link at the bottom of a page. *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 936 (E.D. Va. 2010); *see also Nguyen v. Barnes & Noble, Inc.*, 12-CV-0812, 2012 WL 3711081 (C.D. Cal. Aug. 28, 2012) (refusing to enforce arbitration agreement where notice of browsewrap agreement was predicated merely on a link at the bottom of the website). Similarly, courts will refuse to enforce browsewrap arbitration provisions where there is a failure to allege "facts tending to show that a user would have had actual or constructive knowledge of the Terms and Conditions." *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 25 (2d Cir. 2010).

There is also a middle ground, in which the proper formation of browsewrap agreements hinges on a triable question of fact. *See, e.g.*, *Pollstar*, 170 F. Supp. 2d at 981–82 (denying motion to dismiss where notice of browsewrap was an open question due to the link's small lettering and potentially obfuscatory coloring). Similarly, records may be too incomplete or conflicting at the motion to dismiss or demurrer stage for a court to find the proper formation of a contract. *See, e.g.*, *Montgomery v. Orbitz LLC*, No. BC335441, 2006 WL 6627712 (Mar. 16, 2006 Cal. Super.Ct.) (refusing to enforce browsewrap agreement at the demurrer stage because of factual uncertainty).

Here, Be In's SAC alleges that "the home page of www.camup.com includes a link to CamUp's 'Terms of Service.'" SAC ¶ 98.[5] The SAC further alleges that the Terms of Service stated "at all relevant times" that "by using and/or visiting this Website . . . , you signify your agreement to these Terms of Use, [and] CamUp's Privacy Policy . . . . If you do not agree to any of these Terms of Use, or the CamUp Privacy Policy, you must discontinue use of the CamUp Website immediately." *Id.* The Terms of Service also contain a number of prohibitions that specifically disallowed the "use, copying, or distribution of any of the [CamUp] content." *Id.*[6] Defendants are alleged to have "used and/or visited the CamUp website" in violation of these terms. *Id.* ¶ 101–102.

_____

[5] Be In does not explicitly allege that the home page contained a link to the Terms of Service at all relevant times. *Compare* SAC ¶ 98, *with id.* ¶¶ 99–103. However, construing all reasonable inferences in Plaintiff's favor, the Court assumes that the CamUp homepage contained a link to the Terms of Service at the time of Defendants' alleged access.

[6] The Terms of Service, as alleged in the complaint, read as follows:

> By using and/or visiting this Website (collectively, including all content and functionality available through the CamUp.com domain name, the "CamUp Website", or Website"), you signify your agreement to these Terms of Use, and CamUp's Privacy Policy. . . . If you do not agree to any of these Terms of Use, or the CamUp Privacy Policy, you must discontinue use of the CamUp Website immediately. . . .

> The content on the CamUp Website, except all User Submissions (as defined below), including without limitation, the text, software, scripts, graphics, photos, sounds, music, videos, interactive features and the like ("Content") and the trademarks, service marks and logos contained therein ("Marks"), are owned by or licensed to CamUp, subject to copyright and other intellectual property rights under the law. Content on the Website is provided to you AS IS for your information and personal use only and may not be downloaded, copied, reproduced, distributed, transmitted, broadcast, displayed, sold, licensed, or otherwise for any other purposes whatsoever without the prior written consent of the respective owners. CamUp reserves all rights not expressly granted in and to the Website and the Content. . . .

> You agree: not to distribute in any medium any part of the CamUp Website without CamUp's prior written authorization; to not engage in the use, copying, or distribution of any of the Content other than expressly permitted herein, including any use, copying, or distribution of User Submissions of third parties obtained through the Website for any commercial purpose and that you may not use the Website in any way that is unlawful or fraudulent, or has any unlawful or fraudulent purpose or effect.

Case No.: 12-CV-03373-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AND FOURTH CAUSES OF ACTION WITHOUT PREJUDICE AND GRANTING WITH PREJUDICE DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S THIRD CAUSE OF ACTION

1       The Court finds that these pleadings are insufficient to establish contract formation because,

2   as a matter of law, they do not establish grounds for the Court to find a manifestation of

3   Defendants' mutual assent to the Terms of Service. Be In argues that the SAC properly alleges that

4   Defendants agreed to the Terms of Service because of its conclusory statement that "Defendants

5   agreed to [the Terms of Service] when they used and/or visited the CamUp website." *See* MTD

6   Opp. at 15–16 (citing SAC ¶ 58). This is not a factual allegation sufficient to support the formation

7   of a contract, but rather a conclusion of law "couched as a factual allegation." *Iqbal*, 556 U.S. at

8   678. Defendants' mere use of the website can only serve as a manifestation of assent where

9   Defendants had, or should have had, reason to know that mere use would be so interpreted. *See*

10  Restatement (Second) of Contracts § 19 (1981) ("The conduct of a party is not effective as a

11  manifestation of his assent unless he intends to engage in the conduct and knows or has reason to

12  know that the other party may infer from his conduct that he assents.") The SAC provides no

13  grounds, beyond the mere existence of a link, for the Court to find that Defendants were put *on*

14  *notice* that mere use of the website would be interpreted as agreement to the Terms of Service.[7]

15  The SAC does not allege the size or typeface of the link, the perhaps central or obvious location of

16  the link on the page, or even the text of the link,[8] but merely alleges the existence of such a link.

17  *See* SAC ¶ 98. Because browsewrap agreements, where enforceable, are a powerful means of

18  binding users with very little affirmative assent, a complaint must state facts establishing the means

19  by which the link in question would give notice to a reasonably prudent internet user. *Cf. Specht*,

20  306 F.3d at 20 (refusing to enforce browsewrap where reasonably prudent internet user was not

21  provided reasonable notice of the agreement); *Cvent*,739 F. Supp. at 936 (dismissing breach of

---

[7] Be In's Opposition to the Motion to Dismiss does describe the link with somewhat more specificity. MTD Opp. at 16 n.4. However, this description is still sparse, providing only that "[t]he link to Terms of Service is one of only two links on the CamUp home page in addition to the registration and login link." As this description is not present in the SAC or otherwise supported by declaration or judicial notice, the Court cannot rely on this description as grounds for distinguishing *Cvent*.

[8] An HTML link generally contains visible text that may be clicked on, "title" text that is generally only visible when the user hovers the cursor over the link, and a URL to which the link points. Any or all of these could serve to provide notice to visitors, though, conversely, any or all could fail to make clear the content or meaning of the linked page.

17

United States District Court
For the Northern District of California

1    contract action based solely upon allegations of the existence of a link). Be In fails to provide those

2    facts. Accordingly, Be In has not provided allegations from which the Court can infer valid

3    contract formation in this case.

4           Be In's claim that "courts routinely enforce browsewrap agreements," MTD Opp. at 16, is

5    thus inapposite. Although courts do enforce browsewrap agreements, Be In points to no case in

6    which a court has enforced such an agreement without some showing of notice to the user. *See*

7    MTD Opp. at 16. In *Molnar v. 1-800-Flowers.com, Inc.*, No. 08-CV-0542, 2008 WL 4772125

8    (C.D. Cal. Sept. 29, 2008), the party claiming breach alleged actual knowledge of the terms with

9    two supporting factual theories. 2008 WL 4772125 at *6. In *Ticketmaster L.L.C. v. RMG*

10   *Technologies, Inc.*, 507 F. Supp. 2d 1096 (C.D. Cal. 2007), the defendant "d[id] not contest that it

11   was on notice of the Terms of Use." 507 F. Supp. 2d at 1107. In *Pollstar*, the court was presented

12   with facts concerning the layout and presentation of the webpage and browsewrap agreement at

13   issue that were sufficient to defeat a motion to dismiss. 170 F. Supp. 2d at 980–82. There, the

14   website's contents were alleged in the complaint, and the defendant requested and received judicial

15   notice of the website itself. *Id.* at 978. The present case is not comparable to any of Be In's cited

16   authority because Be In has not sufficiently alleged how its link would provide notice. SAC ¶ 98.

17          The Court declines to accept that a breach of contract claim is properly pleaded under such

18   circumstances and GRANTS without prejudice Defendants' Motion to Dismiss Be In's claim for

19   breach of contract. Under Rule 15(a), leave to amend generally shall be denied only if allowing

20   amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the

21   moving party has acted in bad faith. *See Leadsinger*, 512 F.3d at 532. Because none of these

22   conditions are met, the Court finds it appropriate to grant Be In leave to amend its complaint and

23   plead additional facts in support of its claim.

24   **IV.    CONCLUSION**

25          For the foregoing reasons, the Court GRANTS with leave to amend Defendants' Motion to

26   Dismiss claims one and four of the SAC. Any amendment to the SAC must be filed by November

27

28
     Case No.: 12-CV-03373-LHK
     ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AND FOURTH CAUSES OF
     ACTION WITHOUT PREJUDICE AND GRANTING WITH PREJUDICE DEFENDANTS' MOTION TO DISMISS
     PLAINTIFF'S THIRD CAUSE OF ACTION

18

1   1, 2013. Failure to cure deficiencies identified in this Order will result in the dismissal of these

2   claims with prejudice. No new causes of action or parties may be added without leave of the Court

3   or party stipulation pursuant to Federal Rule of Civil Procedure 15. The Court GRANTS with

4   prejudice the Defendant's Motion to Dismiss claim three of the SAC. Because Be In agrees to the

5   dismissal of its request for statutory copyright damages, *see* MTD Opp. at 23, the Court GRANTS

6   Defendants' Motion to Dismiss Be In's request for statutory copyright damages.

7   **IT IS SO ORDERED.**

8   Dated: October 9, 2013

9                                                LUCY H. KOH
                                                 United States District Judge

United States District Court
For the Northern District of California

19

Case No.: 12-CV-03373-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AND FOURTH CAUSES OF
ACTION WITHOUT PREJUDICE AND GRANTING WITH PREJUDICE DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S THIRD CAUSE OF ACTION